OPINION
{¶ 1} Dwayne A. Jeffers, defendant-appellant, appeals from the judgment of the Franklin County Court of Common Pleas, in which the court found appellant guilty, pursuant to a jury trial, of aggravated murder with firearm specifications I and II, in violation of R.C.2903.01, which is an unclassified felony. The trial court also found appellant guilty, pursuant to a plea of guilty, of having a weapon while under disability, in violation of R.C. 2923.13, which is a third-degree felony. Appellant also appeals from the judgment of the same court, in which the court denied his motion for a new trial.
 {¶ 2} On December 3, 2004, at approximately 4:00 a.m., John Sims and his wife, Sonia Sims, who lived on Willamont Avenue in Columbus, Ohio, were roused from sleep *Page 2 
by noises outside their bedroom window. From the bedroom window, Mr. Sims saw a group of males beating up another male, later identified as Larry Hylton, in the yard across the street, and he called 911. Mrs. Sims then reported to her husband that the male being assaulted had been shot, prompting Mr. Sims to call 911 again. Mrs. Sims stated one of the men had been beating up the victim and then had gotten into a white sport utility vehicle ("SUV"). This man retrieved a gun and returned to the victim and shot him several times. The shooter then returned to the white SUV and got in the driver's side. Mr. Sims saw the white SUV, along with one or possibly two other vehicles, depart the scene.
 {¶ 3} City of Columbus Police Officer Jack Adkins responded to the 911 call and, en route, saw a white SUV and a green SUV parked on the side of a road. The vehicles drove several hundred yards until the officer effectuated a stop on the vehicles, which were less than two miles from the crime scene. Fernando Anderson and Larry Moore were in the green SUV, and appellant and Antjuan Brisco were in the white SUV. Officer Adkins noticed that the passenger of the white SUV, appellant, had the window rolled down and had his arm outside the window. A revolver was later found near where the vehicle had been stopped. The revolver was determined to be the same one used to shoot the victim.
 {¶ 4} On December 9, 2004, appellant was indicted on one count of aggravated murder with two firearm specifications and one count of having a weapon while under disability. A jury trial was held on the count of aggravated murder with the two specifications. On November 21, 2005, the jury found appellant guilty of aggravated murder. Appellant also pled guilty to having a weapon while under disability, and the trial court found him guilty as charged on that count. The trial court sentenced appellant to imprisonment terms of 20 years to life on the aggravated murder charge, three years on *Page 3 
the second firearm specification (with which the first firearm specification merged for purposes of sentencing), and three years on the having a weapon while under disability count, all to be served consecutively. On December 5, 2005, appellant filed a motion for new trial based upon juror misconduct, which the trial court denied on March 20, 2006, without an evidentiary hearing. Appellant appeals the judgments of the trial court, asserting the following assignments of error:
 [I.] JEFFERS' RIGHT TO PRESENT A DEFENSE, TO DUE PROCESS AND A FUNDAMENTALLY FAIR TRIAL WAS DENIED BY THE TRIAL COURT['S] LIMITATION ON EVIDENCE DEMONSTRATING THAT SOMEONE ELSE HAD COMMITTED THIS CRIME IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, §§ 2, 9, 10 16 OF THE OHIO CONSTITUTION.
 [II.] THE TRIAL COURT ERRED IN FAILING TO GRANT JEFFERS'S MOTION FOR NEW TRIAL, OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING. THE FAILURE TO GRANT THE NEW TRIAL OR A HEARING DENIED JEFFERS HIS RIGHT TO DUE PROCESS, A FAIR TRIAL, A FAIR AND IMPARTIAL JURY AND THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 9, 10 16 OF THE OHIO CONSTITUTION.
 [III.] JEFFERS['] CONVICTIONS ARE BASED ON EVIDENCE THAT IS INSUFFICIENT AS A MATTER OF LAW. IN ADDITION, THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 [IV.] THE REPRESENTATION PROVIDED TO DWAYNE JEFFERS FELL BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AS WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION.
 [V.] A TRIAL COURT MAY NOT SENTENCE A DEFENDANT TO A MORE THAN MINIMUM AND CONSECUTIVE *Page 4 
SENTENCES [sic] BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY DEFENDANT. THIS VIOLATED JEFFERS'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 10 AND 16 OF THE OHIO CONSTITUTION.
 {¶ 5} Appellant argues in his first assignment of error that the trial court erred when it denied his attempt to present evidence as to Brisco's prior two convictions for carrying a concealed weapon, which occurred in June 1997 and December 2003, and Brisco's pending indictment for carrying a concealed weapon, which arose from an arrest of Brisco two weeks before the incident in question, on November 19, 2004. Appellant argues that this evidence of other acts was admissible to show Brisco's identity as the shooter and his opportunity to commit the crime, under Evid.R. 404(B), which provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 6} An accused cannot be convicted of one crime by proving he committed other crimes or is a bad person. State v. Jamison (1990),49 Ohio St.3d 182, 183. Generally, in a criminal trial, evidence of previous or subsequent criminal acts, wholly independent of the offense for which a defendant is on trial, are inadmissible. State v. Smith
(1990), 49 Ohio St.3d 137, 139. Exceptions to this general rule are limited by Evid.R. 404(B) to instances where the probative value of the evidence is sufficient to allow its admission. Id. Furthermore, under Evid.R. 403(A), even relevant evidence which is admissible under ordinary circumstances must be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice. *Page 5 
 {¶ 7} Because Evid.R. 404(B) codifies an exception to the common law with respect to evidence of other acts of wrongdoing, it must be construed against admissibility, and the standard for determining admissibility of such evidence is strict, State v. Broom (1988),40 Ohio St.3d 277, paragraph one of syllabus. Further, generally, a trial court enjoys broad discretion in admitting or excluding evidence, and that decision will not be reversed on appeal absent a finding of abuse of discretion. State v. Williams (1982), 7 Ohio App.3d 160, paragraph one of the syllabus. The term "abuse of discretion" connotes more than an error of law; it implies that the court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 8} The Ohio Supreme Court has held that evidence of other acts is admissible if: (1) there is substantial proof that the alleged other acts were committed by the defendant; and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. State v. Lowe (1994),69 Ohio St.3d 527, 530. Both prongs must be satisfied for the evidence to be admissible. State v. Echols (1998), 128 Ohio App.3d 677, 692.
 {¶ 9} Initially, we note that other acts offered as probative evidence of the matter must generally be temporally connected to the alleged crime. State v. Griffin (2001), 142 Ohio App.3d 65, 72, citing State v.Burson (1974), 38 Ohio St.2d 157. The prior act must not be too remote and must be closely related in time to the offense charged. State v.Schaim (1992), 65 Ohio St.3d 51, 60. A prior act that is too distant in time has no permissible probative value. State v. Snowden (1976), 49 Ohio App.2d 7, 10. With these tenets in mind, at the outset, we find the offenses for carrying a concealed weapon occurring in June 1997 and December 2003, to be too temporally removed from the *Page 6 
December 2004 incident in the present case. That Brisco carried a concealed weapon both seven and one-half years and one year prior to the incident in question cannot be said to tend to establish Brisco as the shooter with a different handgun in 2004, or that he had an opportunity to carry and use a handgun in December 2004. See State v. Parrish
(1991), 71 Ohio App.3d 659, 666 (evidence that appellant possessed a gun two months after the crime occurred was not relevant to show that appellant had access to firearms at the time of the shooting because it was too remote in time); State v. Mays (Oct. 22, 1998), Cuyahoga App. No. 73376 (evidence that appellant possessed firearms one and a half to two years before the shooting was too remote in time to demonstrate that appellant possessed a gun on the day of the shooting). Thus, the trial court did not err in excluding evidence of the 1997 and 2003 offenses.
 {¶ 10} As for the carrying a concealed weapon offense on November 19, 2004, two weeks prior to the crime in question, we first point out that Brisco was not found to be carrying a concealed weapon on the night in question or determined to be the owner of the weapon found near the car he was driving, thereby necessitating not only the ultimate inferential leap that the November 2004 offense tended to demonstrate that Brisco shot Hylton two weeks later, but that he was carrying a weapon in the first place, which was not supported by any evidence at trial. Additionally, carrying a gun, in and of itself, cannot be considered a violent act. State v. Brown, Cuyahoga App. No. 87947, 2007-Ohio-287, at ¶ 16. The act at issue in Brisco's prior offense was his possession of a handgun, while the offense at issue in the present case is the use of a handgun to murder another, which are two very disparate offenses. SeeUnited States v. Murray (C.A.7, 2007), 474 F.3d 938, 939 (the other crime and the present crime must be sufficiently alike to make it likely that the *Page 7 
same person committed both crimes, or the evidence will flunk "Rule 403's" test). Thus, evidence of Brisco's prior instance of carrying a weapon cannot tend to demonstrate he murdered Hylton two weeks later without at least some additional evidence of corresponding prior gun-related violence to link the prior weapon offense with the later murder offense. See Snowden, at 10 (a prior act that is too removed in type has no permissible probative value). Lacking such evidence here, the prior carrying a concealed weapon offense was not relevant to prove the later murder. See Burson, supra, at 158 (evidence of other acts of a defendant is admissible only when it is relevant to prove the guilt of the defendant of the offense in question).
 {¶ 11} Notwithstanding the shortcomings noted above, we still find that the November 2004 offense was not admissible. We fail to see how Brisco's prior arrest for carrying a weapon could present him with the opportunity to murder Hylton. It appears that Brisco's prior arrest for carrying a weapon unrelated to the current case would demonstrate only that he had a general propensity to carry weapons, which is specifically prohibited by Evid.R. 404(B). Significantly, although this court stated in Parrish, supra, at 66, that, if a defendant had possessed a gun within a "few weeks" of a murder, the evidence "may have been" relevant to show the defendant had the opportunity to possess firearms, the present case differs from Parrish. In Parrish, police discovered the defendant's guns two months after the murder, while, in the present case, Brisco's gun was discovered prior to the murder. Given that Brisco's handgun was confiscated prior to the shooting in the present case, Brisco did not have any greater opportunity to possess that same handgun on the night of Hylton's murder. Highlighting the significance of this distinction between the two cases is our comment inParrish that none of the guns confiscated by police two months *Page 8 
after the murder were used in the shooting. Id. Of course, here, the gun used to kill Hylton was likewise not the gun confiscated from Brisco on November 19, 2004, which diminishes the relationship between the two unrelated events.
 {¶ 12} The November 2004 incident also did not tend to establish Brisco's identity as the shooter. There was no evidence that the gun from November 2004 shared any specific peculiarities or unique similarities that would have tended to suggest that Brisco only carried that style or make of weapon, which may distinguish him from other criminals. Other acts may establish identity only when they are unique and identifiable. Jamison, at syllabus. Nor was there any evidence that Brisco used the gun, displayed it, or handled it in any peculiar fashion in November 2004, that may lead to identifying the criminal actor in the present case. See Burson, at 159 (the other acts of the defendant must have a modal or situational relationship with the acts constituting the crime charged); McCormick, Evidence (3 Ed.1984) 559, Section 190 (where the pattern and characteristics of the crimes are so unusual and distinctive as to be like a signature, evidence of a defendant's prior crimes is admissible to prove that it was indeed the defendant that committed the charged crime). Further, the mere possession of a firearm, in and of itself, is not distinctive enough to demonstrate identity through pattern of conduct. "[U]se of such `garden variety' criminal acts to establish a pattern can only lead to an inference of propensity that is improper under Rule 404(b)." United States v. Thomas (C.A.7, 2003), 321 F.3d 627, 635 (the pattern in which a defendant in possession of contraband, who, upon seeing police at night, drops or hides that contraband, then flees on foot is too generic to establish identity), citing United States v. Carroll (C.A.8, 2000), 207 F.3d 465, 468-469. Also, given the number of members of the public who own firearms, that Brisco possessed a firearm two weeks *Page 9 
before the murder here does not distinguish his identity from that of the general population. Therefore, for the above reasons, we find the trial court did not abuse its discretion when it denied appellant's attempt to present evidence as to Brisco's prior two convictions for carrying a concealed weapon and Brisco's pending indictment for carrying a concealed weapon. Appellant's first assignment of error is overruled.
 {¶ 13} Appellant argues in his second assignment of error that the trial court erred when it failed to grant his motion for new trial, or, in the alternative, an evidentiary hearing, based upon juror misconduct. Appellant argues that he was denied a fair trial because one of the jurors, Chestine Mackey, failed to disclose on the jury questionnaire or during voir dire that she had a brother murdered by a handgun. The decision to grant or deny a motion for a new trial is within the sound discretion of the trial court, and, absent an abuse of discretion, that decision will not be disturbed. State v. Schiebel (1990),55 Ohio St.3d 71, paragraph one of the syllabus. " `It is clear from the language of Crim.R. 33 that a new trial is not to be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule, or was thereby prevented from having a fair trial. See Crim.R. 33(E).' " State v. Samatar, 152 Ohio App.3d 311,2003-Ohio-1639, at ¶ 35, quoting Columbus v. Carroll (Aug. 27, 1996), Franklin App. No. 96APC01-90. Further, a trial court has broad discretion in determining a juror's ability to be impartial. State v.Dennis (1997), 79 Ohio St.3d 421, 427. Thus, a trial court's decision regarding the dismissal of a juror will be reversed only if the court has abused its discretion. State v. Midwest Pride IV, Inc. (1998),131 Ohio App.3d 1, 19, citing Berk v. Matthews (1990), 53 Ohio St.3d 161,167. *Page 10 
 {¶ 14} In State v. Vasquez, Franklin App. No. 03AP-460,2004-Ohio-3880, this court recognized that, because the bias of a juror will rarely be admitted by the juror himself, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it, it necessarily must be inferred from surrounding facts and circumstances. Id., at ¶ 14, quoting McDonoughPower Equip., Inc. v. Greenwood (1984), 464 U.S. 548, 558,104 S.Ct. 845, Brennan, J., concurring. A juror's failure to respond to a material question on voir dire entitles a party to a new trial only if the juror's failure to disclose denied the party his right to an impartial jury. Id., at 549. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. Id., at 556.
 {¶ 15} In the present case, appellant attached to his motion for new trial newspaper clippings from July 1976, indicating that Mackey's brother, Foster Mackey, shot and killed another man who had shot and killed another Mackey brother, Samuel Mackey, and Mackey never offered this information during voir dire or on her questionnaire. Specifically, appellant argues herein that the trial court erred because, in its March 20, 2006 decision denying appellant's motion for new trial, the trial court stated that it appeared the Mackey brother who was shot was shot by another brother. The court indicated that, under such circumstances, Mackey might have identified with Hylton, the victim of the shooting in the case at bar, or with appellant, the perpetrator in the case at bar. The trial court added that, had the perpetrator been someone other than a member of Mackey's own family, "another question" would be presented.
 {¶ 16} It is clear from the newspaper clippings that the trial court's facts in the above respects were incorrect and could not support the denial of appellant's motion for new trial. *Page 11 
However, reviewing the totality of the trial court's decision, we cannot say the trial court abused its discretion in denying appellant's motion for new trial. Initially, we note that, although the trial court was incorrect that one of Mackey's brothers murdered her other brother, we concur in the trial court's sentiment that Mackey might have identified with Hylton, the victim here, or with appellant, the perpetrator in the case at bar, because, in her circumstances, one brother was a victim and one brother was a perpetrator. Although she might harbor resentment toward the man who shot her brother, she may feel compassion or pity for her other brother who shot the other party. Thus, in one respect, the trial court's reasoning is still correct, despite the factual error.
 {¶ 17} Appellant contended in his motion for new trial that Mackey failed to volunteer a response to a voir dire question regarding crimes against the prospective jurors or their family members. The only question that was asked the jurors that directly addressed this issue was the following:
 Is there anyone here who's been the victim of any sort of violent crime? And by that I would include anything that's face-to-face. And anything that involved you or close friends or immediate family members, people that you feel strongly about. The type of crimes I am suggesting here would be armed robbery or lesser sorts of robbery that somebody might call mugging, even if it's without the weapon; assault, which would include shootings and stabbings; home invasions, which would be burglaries of your home while you're present.
(Nov. 14, 2005 Tr. at 28.) Mackey did not volunteer any response to this question.
 {¶ 18} We agree with the trial court's statement that the question was fairly complex with many subparts. Additionally, the question was vague in several respects. Although the state included "immediate family members" when it asked whether anyone had been the victim of a violent crime, the state then immediately narrowed the question to the "type of *Page 12 
crime" such as "armed robbery or lesser sorts of robbery that somebody might call mugging," "assault," and "home invasions." The murder of Mackey's brother did not appear to be related to any of these types of specific crimes mentioned. By the limiting language of the question, Mackey may not have realized that the state wished to know about any kind of violent crime that did not include those further specified in the question, if in fact the state wished to do so. In addition, because the murder of Mackey's brother was so remote in time — 30 years prior to the present trial — Mackey might not have related her brother's murder to the question posed by the state. The state's use of the term "immediate family," without further definition, could have been construed by Mackey to mean her current immediate family, such as a spouse and children, rather than a sibling who died three decades earlier and whose death might not immediately come to mind. SeePearson v. Gardner Cartage Co. (1947), 148 Ohio St. 425 (stating it had become a new form of indoor sport for parties, after the rendering of an adverse verdict, to start on a quiet search in an effort to discover some failure upon the part of a juror to disclose a prior accident that has grown very hazy in their memory).
 {¶ 19} Further, the trial court made numerous other findings before making the factually inaccurate comment. In its decision, the trial court found that Mackey, who was 73 years old at the time of the trial, was alert during trial and pleasant. The trial court saw no evidence of bias on the part of Mackey, and no jurors suggested Mackey was biased. The trial court also determined that there was no indication that Mackey deliberately concealed the information, it was not unusual for a prospective juror not to answer all questions on a questionnaire, the question asked by the prosecutor was fairly complex with many subparts, and the failure to answer is not necessarily indicative of a deliberate act of *Page 13 
concealment. We agree with these observations. There was no evidence that Mackey intended to deceive the trial court by failing to disclose her brother's murder, and there is no evidence in the record that she was biased because of this event. Indeed, the only evidence in the record is that Mackey was not biased. The court specifically asked all prospective jurors at the close of evidence whether anyone felt, for any reason whatsoever, that it would be inappropriate for him or her to serve on the jury. Mackey did not indicate that she felt it would be inappropriate to serve on the jury. Further, during voir dire, both the state and defense counsel asked periodically whether any prospective juror believed they were biased and whether they believed they could render an impartial decision. The prospective jurors were also told that they could inform the court later if they believed they had answered a question untruthfully or felt they needed to discuss any subject with the court. Mackey did neither. Therefore, the only evidence in the record supports a conclusion that Mackey did not believe she was biased for any reason and that she was able to weigh the evidence without partiality. For all of the above reasons, we find the trial court did not abuse its discretion when it found no evidence of bias on Mackey's behalf and denied appellant's motion for new trial. Appellant's second assignment of error is overruled.
 {¶ 20} Appellant argues in his third assignment of error that the judgment was against the manifest weight of the evidence and based on insufficient evidence. When reviewing the sufficiency of the evidence, an appellate court examines the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact *Page 14 
could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781.
 {¶ 21} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt.State v. Getsy (1998), 84 Ohio St.3d 180, 193-194; State v. Eley (1978),56 Ohio St.2d 169, syllabus. In conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 22} For purposes of this assignment of error, appellant contests only the conviction for aggravated murder. R.C. 2903.01 provides, in pertinent part:
 (A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 23} At trial, John Sims, who lived with his wife, Sonia Sims, across the street from where the murder took place, testified that he looked out his window at 4:00 a.m., and *Page 15 
saw six or seven men beating up another man. A girl was also present. He watched for 30 seconds then called 911. His wife also woke up and looked out the window. She yelled to him that the victim had been shot, and he called 911 again. He told the 911 operator that two cars were at the scene: a white SUV — similar to an Explorer — and another white car-similar to a Neon or Achieva. Mr. Sims then went downstairs and watched the victim take a few steps before collapsing. He also saw a third car, a large black or blue car. He told an investigator, Catherine Cook, that the shooter had a black "puffy" jacket with no design and a hood, although the hood might have been part of another piece of clothing. He was unable to tell Cook the shooter's body size. The other assailants also wore black jackets, and one had on a white, knit cap. Mr. Sims stated the shooter got into the driver's side of the SUV. When shown two black leather jackets at trial, Mr. Sims was not sure whether he had seen either jacket before. Mr. Sims admitted he may have told Cook, on January 14, 2005, that he went back to the window and saw the actual shooting.
 {¶ 24} Sonia Sims testified that, when she looked out the window, she saw a man on the ground being kicked and punched by "several" other men, maybe five. She also saw a girl standing off to the side. The men were wearing dark leather jackets and jersey shirts. Then one man with a dark jacket continued stomping the man while the others watched. This individual man then went to the driver's side of the SUV, retrieved a gun, returned to the man on the ground, and shot him. The shooter had a hood either on his jacket or on another piece of clothing. The shooter yelled for everyone to get in their cars, and the shooter got into the SUV via the driver's side. When shown two leather jackets at trial, she stated she would not have been able to discern the design details on appellant's jacket from her window. She told Cook that the shooter had a slender build and was no more than *Page 16 
six feet tall. The shooter held the gun in his right hand. She also told Cook the shooter had on boots with a big, puffy coat, possibly down.
 {¶ 25} Officer Adkins testified that, after getting a dispatch about someone being beaten, he drove his cruiser toward the scene with his beacon flashing and siren activated. Along the way, he passed two cars pulled to the curb, one a white SUV and one a green SUV. He turned his cruiser around and approached the vehicles. The vehicles started driving away for 250 to 300 yards and then finally stopped. As Adkins approached the white SUV, he noticed the front seat passenger's arm hanging out the window, despite the cold weather. Adkins removed appellant, who was the passenger in the front seat. As he searched the side of the roadway, Adkins found a silver revolver lying in the grass about 10 to 15 yards from where the white SUV had finally stopped.
 {¶ 26} Adkins also testified that the two SUVs had been no more than a car length apart when they stopped, and the gun would have been 15 to 20 yards from the passenger's window of the green SUV. He also noticed a strong odor of alcohol on appellant, and, when he removed appellant and performed a patdown, appellant nearly fell and stumbled. Adkins had to pick him up and hold onto him. Appellant also slurred his speech.
 {¶ 27} Smith Weir, a City of Columbus police officer, testified he initiated the traffic stop of appellant's vehicle with Adkins. Weir observed the passenger in the white SUV moving around inside the vehicle.
 {¶ 28} Janel Mead, a City of Columbus police detective, testified that one photograph taken of appellant showed a blood stain on the thigh of his pants. When Mead *Page 17 
witnessed Brisco and appellant at 10:50 a.m. on December 3, 2004, neither seemed intoxicated.
 {¶ 29} Collie Trant, the forensic pathologist deputy coroner who performed the autopsy on Hylton, testified Hylton had six gunshot wounds to his body. He stated that the "glob" of blood staining appellant's pants would not be from "blow back" due to a gunshot, as "blow back" would be much smaller. He stated such a stain, as on appellant's pants, could have been due to compression transfer resulting from coming in contact with Hylton's body.
 {¶ 30} Dorlisa Robinson testified that she went to Club Mercedes after she got off work the night in question. She spoke with Hylton, a childhood friend. Appellant approached with some other men and stated that Robinson was the woman who hit him in the head with a glass and he should smack her. She had seen appellant "around" for the past few years, and he had dated some of her friends. She explained that, two years prior, there had been an incident between her and appellant that resulted in the two of them not getting along. When appellant made the statement to Robinson, Hylton intervened and "had words" with appellant. Hylton told Robinson to leave, and she left the bar about 3:00 a.m. She stated she knew appellant drove a white SUV. Robinson admitted that she did not tell the police in her first interview that she witnessed a confrontation between appellant and Hylton at the club. She also did not tell the police in the first interview that security personnel at the bar had to intervene between appellant and Hylton. She stated she was scared when she spoke to police, and she told the police more in her second interview than she had in her first. *Page 18 
 {¶ 31} Mark Handy, a City of Columbus police criminalist, testified that he tested the gun that was recovered near the white SUV and the spent bullets at the scene. He concluded that the spent bullets from the scene were fired from the gun recovered near the white SUV.
 {¶ 32} Raman Tejwani, who is employed with the City of Columbus police crime lab, testified that the DNA on blood swabs gathered from appellant's fingernail clippings matched Hylton's DNA. He was unable to match DNA on the grip of the handgun to either Brisco, appellant or Hylton, and he was not asked to compare it to any of the others allegedly present at the scene. Tejwani also testified that the DNA obtained from the bloodstain on appellant's jeans matched Hylton's DNA.
 {¶ 33} Daniel Davidson, a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation, performed gun residue tests on samples taken from several people. No gunshot residue was found on the left hand of Larry Moore, but there was residue on his right hand. There was no residue on the left or right hands of Fernando Anderson or Brisco. There was residue on both of appellant's hands. He stated that one can have residue on his skin by firing a gun, by being close to a gun when it is fired or touching an object that was near a gun when it is fired.
 {¶ 34} Dana Farbacher, a detective with the City of Columbus Police Department, testified that it was possible for someone to touch an object and not leave fingerprints. He also testified that the white SUV belonged to appellant's relative. Appellant told Farbacher he was not driving the vehicle that night because he had been intoxicated, and appellant stated there had been no arguments or disturbances at Club Mercedes while he was there. Appellant denied he had been on the street on which Hylton was killed and denied even *Page 19 
knowing the location of that street. Appellant told Farbacher that neither he nor Brisco had a gun that night. When Farbacher showed him a photograph of Hylton, appellant stated he recognized him, but did not know him. Appellant stated he had seen Hylton at Club Mercedes and might have even shaken his hand and bought him a drink. Appellant told him that the blood on his pants could not be Hylton's blood.
 {¶ 35} Farbacher further testified that he interviewed Robinson the night of the murder, and Robinson called later to say she wanted to talk to him again the next night. Farbacher then interviewed Robinson again the night after the murder. Farbacher stated that, during his first interview with Robinson at 7:15 a.m. on the day of the murder, she stated there was no argument between appellant and Hylton, but appellant made some "smart comment" to Hylton. She told him in the first interview that she only saw appellant and Hylton as she was leaving the bar. In the second interview, at 1:15 a.m. on December 4, 2004, Robinson told him that there had first been a confrontation between appellant and her and then appellant and Hylton at Club Mercedes, and security personnel had to step in between appellant and Hylton. Farbacher contacted three security personnel who were working the night in question, and they were unable to verify a confrontation. Farbacher believed the information Robinson gave him in the second interview was more truthful than that given in the first.
 {¶ 36} With regard to appellant's sufficiency of the evidence argument, we find there was sufficient evidence to prove the elements of aggravated murder. We essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime. State v. Woodward, Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 16. Mr. and Mrs. Sims stated the shooter had a dark or black "puffy" jacket. *Page 20 
Appellant was found in the SUV wearing a baggy black jacket when he was apprehended. Mrs. Sims also stated that the shooter shot Hylton standing alone while the others watched from a distance, and the shooter had taken the time to search the white SUV for the gun before walking back to shoot Hylton, which would provide sufficient evidence of prior calculation and design. Further, Tejwani testified that the DNA on blood swabs gathered from appellant's fingernail clippings matched Hylton's DNA, and the DNA obtained from the bloodstain on appellant's jeans matched Hylton's DNA. Davidson testified there was gunshot residue on both of appellant's hands. None of the other four men from the SUVs had residue on both hands or blood on their clothes.
 {¶ 37} In addition, although Mrs. Sims stated the shooter stepped into the white SUV via the driver's side, the SUV was owned by appellant's relative, and it was pulled over to the side of the road when police first saw it. The jury could have reasonably believed that appellant and Brisco, who was in the driver's seat when stopped by police, switched seats in the minutes between the murder and when police spotted the parked vehicle. The reasonableness of this belief could also be buttressed by Adkins' testimony that appellant was intoxicated and might have moved from the driver's seat after stopping. Adkins also stated appellant's hand was hanging out the front seat passenger's window, despite the cold weather, which the jury could have believed showed he threw the gun, which was found only 10 yards from appellant's car window. Weir had also observed appellant in the white SUV moving around inside when the vehicle stopped. Finally, Robinson testified Hylton and appellant "had words" at a club shortly before the murder, which, if believed, would have provided a motive for appellant to murder Hylton. Although much of this evidence is circumstantial, circumstantial evidence may be more certain,
No. 06AP-358 21
satisfying, and persuasive than direct evidence. State v. Richey
(1992), 64 Ohio St.3d 353, 363. Circumstantial evidence also carries the same weight and should be given the same deference as direct evidence.Jenks, supra. Therefore, based on the above testimony, and construing that testimony in favor of the state, we find the state presented sufficient evidence beyond a reasonable doubt to prove the elements of aggravated murder. For these reasons, we find the jury's verdict was based upon sufficient evidence.
 {¶ 38} With regard to appellant's manifest weight of the evidence argument, appellant points to several inconsistencies in the testimony of the witnesses and the evidence. Appellant first asserts that Mr. and Mrs. Sims testified that the shooter was wearing a plain black jacket, yet appellant's jacket had an intricate design stitched into it. However, Mrs. Sims specifically testified that she would not have been able to discern the design on the jacket from her window, which was on the second floor of her residence and across the street from the scene of the crime. Further, although appellant also points out that there was no fingerprint evidence, Farbacher testified that it is possible for someone to touch an object and not leave fingerprints. Thus, the lack of any fingerprints on the gun is not, in and of itself, compelling.
 {¶ 39} Appellant also argues that Robinson's testimony was conflicting and, thus, could not be believed. Appellant points out that, when she was first interviewed by police, Robinson did not indicate that appellant and Hylton had been in a confrontation, yet she later told police that the two had an argument. However, the jury could have discounted or reconciled this discrepancy. Robinson admitted that she told police more in her second interview than she had in her first, and stated that she did so because she was scared when she first spoke to police. Farbacher also testified that he believed Robinson's later *Page 22 
version of the events and thought she was telling the truth. The jury is in the best position to assess the credibility of witnesses.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Whether the jury found Robinson's story believable is entirely within its discretion, and we have no reason to question it.
 {¶ 40} We also note that appellant lied to Farbacher and denied he had been on the street Hylton had been killed on. Appellant denied even knowing the location of that street. Appellant also told him that the blood on his pants could not be Hylton's blood. Given that the evidence demonstrated Hylton's blood was on appellant's pants and under his fingernails demonstrates appellant lied to Farbacher. The jury could have found that appellant's dishonesty to the police was inconsistent with his claim of innocence.
 {¶ 41} Therefore, viewing all the reasonable inferences that arise from the evidence and having no reason to disturb the weight given to this evidence by the jury, we cannot find the jury clearly lost its way and created a manifest miscarriage of justice. With no compelling reason to question the state's evidence and testimony elicited at trial from its witnesses, we can only conclude that the testimony of the witnesses was truthful. Thus, the jury's verdict finding appellant guilty of aggravated murder was not against the manifest weight of the evidence. For these reasons, appellant's third assignment of error is overruled.
 {¶ 42} Appellant argues in his fourth assignment of error that he was denied effective assistance of trial counsel. The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed defendant under the Sixth Amendment, and (2) that the deficient performance prejudiced defendant's *Page 23 
defense. Strickland v. Washington (1984), 466 U.S. 668, 686-687,104 S.Ct. 2052. Essentially, appellant must show that the proceedings, due to his attorney's ineffectiveness, were so unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. Id., at 693. Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Id., at 689. In Ohio, a properly licensed attorney is presumed to execute his or her duties in an ethical and competent manner. State v.Hamblin (1988), 37 Ohio St.3d 153, 155-156. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. State v. Phillips (1995), 74 Ohio St.3d 72, 85. Reviewing courts must not use hindsight to second-guess trial strategy, and must bear in mind that different trial counsel will often defend the same case in different manners. Strickland, at 689; State v. Keenan
(1998), 81 Ohio St.3d 133, 152.
 {¶ 43} Here, appellant contends his trial counsel was ineffective in failing to present the other acts evidence of Brisco to the jury when his counsel: (1) "alerted" the court and the prosecutor that he desired to present other acts evidence prior to proceeding to do so on cross-examination of Weir; and (2) failed to argue the Evid.R. 404(B) exception of opportunity. However, under our treatment of appellant's first assignment of error, we found the trial court did not abuse its discretion when it denied appellant's attempt to present evidence as to Brisco's prior two convictions for carrying a concealed weapon and Brisco's pending indictment for carrying a concealed weapon. In doing so, we addressed the opportunity exception of Evid.R. 404(B) and determined that Brisco's other acts evidence *Page 24 
was not admissible on this ground, or any other. Given this determination, appellant cannot demonstrate that his trial counsel's performance was prejudicial. Further, appellant cannot now complain that his trial counsel should have attempted to elicit testimony and present evidence that is inadmissible. Therefore, we find appellant's trial counsel was not ineffective, and appellant's fourth assignment of error is overruled.
 {¶ 44} Appellant argues in his fifth assignment of error that, based upon Blakely v. Washington (2004), 524 U.S. 296, 124 S.Ct. 2531, and the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, the trial court erred in sentencing him to a more than minimum sentence and consecutive sentences based upon facts not found by the jury or admitted by appellant, with regard to his having a weapon while under disability charge. Subsequent to appellant's sentencing, the Ohio Supreme Court issued Foster, in which it held that former R.C.2929.14(B) and 2929.14(E)(4) unconstitutionally required judicial fact finding in violation of the Sixth Amendment to the United States Constitution and the rule of law articulated in Blakely. As a result, the court severed those statutes from Ohio's sentencing scheme and thereby granted trial courts the discretion to impose non-minimum and consecutive sentences without judicial fact finding. Foster, at ¶ 99-100.
 {¶ 45} Here, the trial court made the factual findings required by former R.C. 2929.14(B) and 2929.14(E)(4) to impose non-minimum and consecutive sentences. Given the holding in Foster, the trial court erred. Further, because appellant raised the Blakely issue at his sentencing hearing, he did not waive the issue for purposes of appeal. See State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, at ¶ 7. *Page 25 
 {¶ 46} We recently addressed the Blakely-Foster error with respect to the factual findings under R.C. 2929.14. In State v. Peeks, Franklin App. No. 05AP-1370, 2006-Ohio-6256, we found such an error by a trial court to be a non-structural constitutional error; thus, the harmless error standard applies. With respect to R.C. 2929.14(E)(4), we determined in Peeks that a trial court's error in sentencing a defendant to consecutive sentences based on factual findings made pursuant to former R.C. 2929.14(E)(4) was harmless beyond a reasonable doubt.Peeks, at ¶ 15. We reasoned that, because R.C. 2929.14(E)(4) required the trial court to make certain findings before it could impose consecutive sentences, that requirement only benefited defendants because a trial court could not impose consecutive sentences unless it made each and every finding. Id. Therefore, consistent with Peeks, the error committed by the trial court in the present case when it sentenced appellant to consecutive sentences, pursuant to R.C. 2929.14(E)(4), benefited appellant and, therefore, was harmless beyond a reasonable doubt. Thus, we overrule that portion of appellant's assignment of error that challenges his consecutive sentences.
 {¶ 47} However, in State v. Withers, Franklin App. No. 06AP-302,2006-Ohio-6989, we applied the same rationale in Peeks to the language in R.C. 2929.14(B) regarding sentences greater than the minimum and concluded that the error committed by the trial court was not harmless beyond a reasonable doubt. Foster, at ¶ 12. We found that, beforeFoster, R.C. 2929.14(B) created a presumption that trial courts would impose the shortest prison term authorized for the offense, and the only way a trial court could overcome that presumption and impose a non-minimum sentence is if it made one of the factual findings required by the statute. Id., citing Foster, at ¶ 60. Thus, we reasoned, the requirement of *Page 26 
factual findings only served to enhance what would otherwise be a minimum sentence, and the trial court's error in making those findings was detrimental to the defendant, because, absent that error, he would have been sentenced to the shortest prison term authorized by law. Id. Therefore, applying our prior precedent in Withers to the present case, we cannot say that the error committed by the trial court was harmless beyond a reasonable doubt. Consequently, we sustain that portion of appellant's assignment of error that challenges his non-minimum sentence. Therefore, appellant's fifth assignment of error is sustained in part and overruled in part.
 {¶ 48} Accordingly, appellant's first, second, third, and fourth assignments of error are overruled, and appellant's fifth assignment of error is sustained in part and overruled in part. The judgments of the Franklin County Court of Common Pleas are affirmed in part and reversed in part, and this matter is remanded to that court for resentencing.
Judgments affirmed in part and reversed in part;
 cause remanded.
SADLER, P.J., and WHITESIDE, J., concurs.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.