DECISION. *Page 2 
{¶ 1} Lorenzo Hairston was shot multiple times outside the Reem Market convenience store in the early afternoon on May 14, 2005. He died the following day from his wounds. Defendant-appellant Random King was indicted for Hairston's murder. Following a jury trial, King was convicted of murder, an accompanying firearm specification, and carrying a concealed weapon.
 {¶ 2} The Reem Market is located at the intersection of Cavanaugh and McHenry Avenues in the Westwood area of Cincinnati. Salah Salah, the manager of the Reem Market, heard shots fired behind the market and called 911 at 13:25:12 to report the incident and to request an ambulance. Patricia Martin, who lived on Cavanaugh Avenue directly across the street from the entrance to the market, called 911 at 13:25:55 and told the operator that she had heard shots fired at the intersection and that she had seen two males running away from the area behind the market.
 {¶ 3} The 911 operator received another call at 13:28:31 from 3344 Saffer Street. The anonymous male caller shouted that "someone got shot and killed behind the Reem Market." The caller then abruptly hung up. About 30 seconds later, Paula Collins called from the same address and stated that "a boy was laying dead after being shot five times outside the Reem Market."
 {¶ 4} Cincinnati Police Officer Robert L. Robinson arrived on the scene first and discovered Hairston lying in the grass near the tree line behind the market. The preliminary information received by the police indicated that the crime had begun on the McHenry Avenue side of the building and then progressed around the Cavanaugh Avenue side of the market to the grassy area. Police officers processing the crime scene recovered *Page 3 
a black jacket belonging to Hairston and a flattened bullet on the McHenry Avenue side of the building near the intersection.
 {¶ 5} The police identified King as a suspect and Bruce Collins and Timothy Chambers as possible witnesses. On May 16, Cincinnati Police Officer Michael Drexelius of the homicide unit saw Collins outside 3344 Saffer Street while Drexelius was following up on the 911 calls that had originated from that address. Collins, who was 19 years old and a friend of Hairston, was reluctant to talk to Drexelius. Eventually Collins told Drexelius that he had heard gunshots when he was walking to the market, but that he had turned around and had not seen the shooting. Later Collins would recant.
 {¶ 6} On May 20, police officers located Chambers and interviewed him at the Criminal Investigations Section's headquarters downtown. Chambers was 15 years old and also a friend of Hairston. Chambers told the investigating officers that he had seen King shoot Hairston and that he had recognized King from the neighborhood. He also positively identified King after examining a photographic array. He told the officers that the shooting had begun on the McHenry Avenue side of the market and continued as Hairston ran through an unpaved alley that separated the McHenry Avenue side of the market from an abandoned building next door. The alley led to the grassy area behind the market where the police found Hairston.
 {¶ 7} The police again located Collins on May 22 and brought him downtown for questioning. Collins asked to remain anonymous and tried to disguise his voice during the taped interview. He again denied having seen the shooting, but eventually told the police that he had witnessed the shooting, and he identified King as the shooter.
 {¶ 8} On May 23, Drexelius returned to the Reem Market to search for evidence along the sidewalk and the muddy, debris-strewn alley where Chambers *Page 4 
and Collins said the shooting had occurred. Drexelius found three shell casings and a spent bullet. King was then arrested and charged with Hairston's murder and carrying a concealed weapon.
 Trial Testimony {¶ 9} At trial, Chambers explained the details of the shooting that he and Collins had witnessed in part. Chambers testified that just prior to the shooting he had been conversing with Collins and Hairston in front of the McHenry Avenue side of the market. During this conversation, King appeared, and an argument between King and Hairston ensued about whether Hairston could be on King's "block." According to Chambers, the argument became physical when Hairston pushed King. King attempted to make a phone call with his cellular phone and told Hairston that he was going to have someone fight Hairston. After this, Chambers saw King pull a small handgun from his back pocket and fire it. According to Chambers, the bullet sounded like it ricocheted off a metal pole near Hairston, and then Chambers saw Hairston put his hand up on his head and lean against the wall. After a pause, King fired another shot. In response, Hairston leaned to the wall for more support and then scooted along the wall into the alley. King chased Hairston, and Chambers heard several more shots. When the shots ended, Chambers and Collins traversed the alley and approached Hairston to see if he was still alive. Then they ran back through the alley to McHenry Avenue on their way to Collins's house, located a short distance from the market at 3344 Saffer Avenue.
 {¶ 10} Chambers admitted that he had not come forward as a witness immediately after the shooting and that he had wanted to avoid testifying.
 {¶ 11} Collins also identified King as the shooter at trial, and he provided details about the shooting consistent with Chambers's testimony. He acknowledged that he had *Page 5 
called 911 after reaching his home on Saffer Street and that he, like Chambers, had wanted to avoid testifying as a witness.
 {¶ 12} Collins's mother testified that she had called 911 after Collins hung up and that she had relayed to the 911 operator what Collins had told her: that a boy had been shot five times behind the Reem Market.
 {¶ 13} Officer Drexelius was one of several police officers who testified about the homicide investigation. Drexelius testified that a few neighbors came forward at the crime scene with information about the shooting. None of these neighbors saw the shooting. Three neighbors, including Patricia Martin, saw two individuals running from the grassy area behind the store to McHenry Avenue after the shooting. Another neighbor, a young boy, told the police that he had seen a single individual running from the grassy area to Cavanaugh Avenue immediately after the shooting. None of these neighbors could identify King from a photo array.
 {¶ 14} Drexelius also stated that the police had identified Chambers and Collins as possible witnesses to the shooting based upon two Crime Stoppers calls and the two 911 calls that had originated from Collins's residence. Drexelius stated that Chambers and Collins had been reluctant to talk to the police, but that both had identified King as the shooter.
 {¶ 15} On cross-examination, Drexelius was asked about a man named Keon Armstrong who had offered information to the police and Crime Stoppers that he had witnessed King shoot Hairston. Drexelius later learned that Armstrong did not like King due to a prior altercation and that Armstrong likely did not witness the shooting. Drexelius admitted that Armstrong's identification of King as the shooter was not credible. *Page 6 
On redirect, Drexelius clarified that he did not rely on Armstrong's statement in deciding to charge King with the shooting.
 {¶ 16} Deputy coroner Cynthia Gardner performed Hairston's autopsy. She testified that Hairston had suffered a total of six gunshot wounds and that the cause of death was injury to the skull and brain due to multiple gunshot wounds. One bullet had entered Hairston's skull near the top of his head and passed through. Another bullet had entered the back of Hairston's skull and remained lodged in Hairston's brain. Gardner recovered this bullet. A third bullet had entered the front right side of Hairston's neck and passed through. Two more bullets had entered Hairston's lower back area: one passed through, and Gardner recovered the other one from Hairston's hip bone. Finally, a bullet had entered the back of Hairston's right hand in the web between the thumb and the first finger and had exited from the palm. Gardner testified that this wound was consistent with a defensive wound, suffered when a victim used a hand to protect another body part.
 {¶ 17} William Schrand, a firearm's examiner from the Hamilton County Coroner's crime laboratory, reviewed the bullets and spent casings recovered in the investigation of the murder. Schrand determined that the two bullets Gardner had recovered during the autopsy and a third bullet recovered from Hairston's clothing at the hospital were all fired from the same .25-caliber semiautomatic pistol. The other two recovered bullets were consistent with ones fired from the same weapon, but these bullets did not have sufficient individualized characteristics for Schrand to scientifically conclude that they had been fired from the same weapon. Additionally, Schrand testified that the three .25-caliber semiautomatic cartridge casings found at the crime scene had the same class characteristics, but that they were not marked well enough for him to scientifically conclude that they had been fired from the same gun as the fatal bullets. *Page 7 
 {¶ 18} James Hunter, a friend of Hairston, testified that he had heard King and Hairston arguing outside the Reem Market at about 5:00 p.m. the day before Hairston's murder.
 {¶ 19} Over King's objection, the state was permitted to introduce testimony that King had twice previously committed the offense of carrying a concealed weapon near the Reem Market. The guns recovered from King on these prior occasions were shown to the jury, but the court did not send the guns to the jury room during deliberations.
 {¶ 20} King presented several witnesses in his defense. Salah, the manager of the Reem Market who had made the first 911 call, testified that he had heard shots fired from behind the store, but that when he looked outside he was not able to see the shooter.
 {¶ 21} Salah authenticated a surveillance video of the inside of the Reem Market that indicated that both King and Hairston had entered and exited the market a few minutes before the shooting. Salah additionally testified that many youths often loitered outside the market.
 {¶ 22} The second 911 caller, Martin, also testified for the defense. She did not see the shooting either. Martin testified that, after hearing five gunshots fired, she looked out her window and saw two African-American males wearing white baseball caps standing across the street in the grassy area behind the market. She thought that one of the males had a "little smile" on his face and described the other one as being in shock. She saw the first male grab the arm of the other and then watched them run towards the alley that led to McHenry Avenue. She knew King but did not identify King as one of the males. Importantly, Martin made her 911 call after Salah's 911 call and contemporaneously with her observation of the two males at the crime scene. *Page 8 
 {¶ 23} On cross-examination, Martin acknowledged that she had told the 911 operator that she could only see the backs of the males and that she could not determine their race. On redirect, she affirmed her trial testimony.
 {¶ 24} King, who testified in his own defense, acknowledged that he had been at the market a few minutes prior to the shooting. But he claimed that he went home after making his purchases. Further, he denied arguing with Hairston outside the market at 5:00 p.m. the day before, and he presented an employment record indicating that he had been at work from 5:00 to 10:00 p.m. that day.
 Batson Challenge {¶ 25} In his first assignment of error, King argues that the trial court erred in overruling his objection to the state's use of a peremptory challenge to dismiss an African-American juror. The state may not use its peremptory challenges during jury selection to exclude a potential juror solely on the basis of race.[1]
 {¶ 26} In Batson v. Kentucky, the United States Supreme Court delineated a three-step inquiry for evaluating whether the state's use of a peremptory challenge is discriminatory.[2] A defendant must first establish a prima facie showing that the state has exercised a peremptory challenge on the basis of race.[3] Then the burden shifts to the state to provide a race-neutral explanation for its challenge.[4] If the state offers a race-neutral explanation, the burden shifts back to the defendant to establish that the reason advanced by the state is pretextual. The court must then determine whether the defendant has proved purposeful racial discrimination.[5] *Page 9 
 {¶ 27} The race-neutral explanation by the state during aBatson challenge does not need to rise to the level justifying a challenge for cause.[6] And a trial court's finding of no discriminatory intent will not be reversed on appeal unless it is clearly erroneous.[7]
 {¶ 28} In this case, King objected after the state had used its second peremptory challenge to excuse Ms. Larry, an African-American, from the jury pool. The state had excused another African-American with its first peremptory challenge. After receiving the objection, the trial court required the state to present a race-neutral reason for excusing Larry. The state provided three reasons: (1) she had been convicted of disorderly conduct; (2) her son had been convicted of robbery and had served a ten-year prison term; and (3) she had been involved in the counseling of drug-and alcohol-dependent individuals, some of whom had been involved in criminal proceedings.
 {¶ 29} King conceded that the reasons given were factually accurate, but he maintained that they were pretextual because Larry's conviction was over 20 years old, and she said that she could be fair to both sides. The trial court accepted the state's explanations as valid and race-neutral, and overruled King's Batson challenge.
 {¶ 30} We first review the first and second reasons provided by the state for excusing Larry. A prior criminal conviction of a prospective juror or a family member of the prospective juror can serve as a valid, race-neutral reason to remove a juror,[8] even if the conviction is not recent.[9] King does not argue that the state gave *Page 10 
these reasons to disguise discrimination or that they were factually inaccurate. Likewise, the third reason for the peremptory challenge was comprehensible, race-neutral, and factually accurate, even if the state did not explain how it would have affected Larry's performance as a juror.[10] The trial court was in the best position to weigh the persuasiveness of the state's reasons and the state's credibility in determining whether there was a discriminatory intent.
 {¶ 31} We note that the jury included three African-Americans, that the state excused a Caucasian, and that the state later waived its last peremptory challenge. We hold that the court did not clearly err in finding no discriminatory intent in the state's use of a peremptory challenge to excuse prospective juror Larry. Accordingly, we overrule the first assignment of error.
 Prior-Acts Testimony {¶ 32} In his second assignment of error, King argues that the trial court erred to his prejudice in admitting evidence of prior acts through the testimony concerning his two previous offenses of carrying a concealed weapon while outside the Reem Market.
 {¶ 33} King's first offense had occurred on February 6, 2004, when King was a juvenile. Police Officer John Mendoza was permitted to testify, over objection, that in the afternoon on that date he was operating undercover when he saw King with another individual on the doorstep of the Reem Market. According to Mendoza, the other individual was rolling what appeared to be a marijuana cigarette. When Mendoza approached, King was uncooperative and was subjected to a pat-down *Page 11 
search. Mendoza recovered a loaded, small-caliber pistol from a pocket in King's jacket. Mendoza showed this gun to the jury.
 {¶ 34} King's second offense occurred a year later, on February 6, 2005, after King had turned 18 years old. Police Officer Toni Lutz was permitted to testify, over objection, that she had approached King in the evening on that date in the parking lot of the Reem Market in response to a trespassing complaint. Lutz asked King to show her his hand and claimed that she had to threaten King with a Taser to force him to cooperate with her order. Lutz later recovered a loaded, small-caliber pistol from King's front right pocket after a pat-down search. Lutz displayed this gun to the jury.
 {¶ 35} Evidentiary rulings generally lie within the broad discretion of the trial court and will form the basis for reversal on appeal only upon an abuse of that discretion amounting to prejudicial error.[11]
In reviewing the trial court's exercise of discretion in admitting the challenged testimony, we are guided by Evid.R. 404(B) and R.C. 2945.59.
 {¶ 36} Evid.R. 404(B) sets forth the common-law rule regarding the admissibility of evidence of previous or subsequent criminal acts that are wholly independent of the offense for which a defendant is on trial. The rule provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The rule then incorporates a nonexhaustive list of exceptions to the common-law rule, stating that "evidence of other crimes, wrongs, or acts * * * may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *Page 12 
identity or absence of mistake or accident." R.C. 2945.59 provides for the admission of other-act evidence under similar circumstances. Essentially, however, "[a]n accused cannot be convicted of one crime by proving he committed other crimes or is a bad person."[12]
 {¶ 37} Pursuant to Evid.R. 404(B) and R.C. 2945.59, other-act evidence may be admitted in a criminal proceeding if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[13] Both prongs must be satisfied for the evidence to be admissible.[14]
 {¶ 38} Because both Evid.R. 404(B) and R.C. 2945.59 provide exceptions to the common-law rule, they must be strictly construed against admissibility.[15] Furthermore, under Evid.R. 403(A), even relevant evidence that would be admissible under ordinary circumstances must be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice.
 {¶ 39} In this case there was substantial proof that King was carrying a concealed weapon outside the Reem Market on one date in February 2004 and on one date in February 2005. The issue before us is whether those prior acts tended to prove any of the enumerated exceptions of Evid.R. 404(B).
 {¶ 40} The state argues that King's prior weapons offenses were admissible under Evid.R. 404(B) as proof of identity. "Other acts" evidence is admissible to show "identity" in two instances: (1) when the other acts "form part of the immediate *Page 13 
background of the alleged act which forms the foundation of the crime charged in the indictment and which are inextricably related to the alleged criminal act,"[16] and (2) when the other acts involve a "unique, identifiable plan of criminal activity" so as to establish that the defendant has a modus operandi or a "behavioral fingerprint" that he used in carrying out the charged offense.[17] Other-acts evidence necessarily "must be related to and share common features with the crime in question" to be admissible to prove identity through a certain modus operandi.[18]
 {¶ 41} According to the state, King's prior weapons offenses established a modus operandi used in Hairston's murder, where all the offenses occurred outside the Reem Market and involved the concealment of a loaded, small-caliber pistol. But we are not convinced that this provided a "unique" pattern that was helpful in determining the identity of Hairston's shooter.
 {¶ 42} The prior weapons offenses were not crimes of violence. King did not shoot, display, or even threaten anyone with a gun as part of his prior offenses. Conversely, Hairston was brutally murdered. He was shot multiple times, even while fleeing.
 {¶ 43} Further, the prior offenses were too remote in time from the murder to be helpful.[19] And the February 2005 weapons offense occurred in the evening on the parking-lot side of the building, not during the day on the McHenry side. Finally, although the murder weapon and the weapons King had been found concealing were all small-caliber guns, they definitely were not the same gun. Nor was there evidence that they were the same make of gun. And there was no testimony that King knew *Page 14 
how to operate the small-caliber weapons he was found concealing outside the market in February 2004 and 2005. Under these circumstances, we conclude that King's mere possession of a firearm in the same general area of the murder on prior occasions was not distinctive enough to demonstrate his identity as the shooter through a pattern of conduct.[20]
 {¶ 44} King's prior weapons offenses and the murder were not sufficiently related and they did not share significant common features. Thus, the prior acts did not meet the strict requirements of a probative "behavioral fingerprint," and the trial court abused its discretion in admitting into evidence testimony related to the other acts.
 {¶ 45} We must now determine whether this error was harmless. "Error in the admission of evidence in criminal proceedings is harmless if there is no reasonable probability that the evidence may have contributed to the accused's conviction. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt."[21]
 {¶ 46} The state argues that any error in the trial court's admission of the other-acts evidence was harmless due to the strength of the admissible evidence and the fact that King testified, opening himself up to cross-examination about his 2005 concealed-weapon conviction under Evid.R. 609. For the reasons cited below, we agree that the trial court's admission of the other-acts evidence was harmless beyond a reasonable doubt. *Page 15 
 {¶ 47} In support of King's conviction, the state presented the testimony of Chambers and Collins, who had both witnessed Hairston's murder and had repeatedly identified King as the assailant. Collins's testimony was bolstered by the 911 call he made immediately after the shooting. Both Chambers's and Collins's testimony was corroborated by the physical evidence recovered by the police during the investigation, the coroner's testimony concerning the location of Hairston's wounds, and the testimony of Salah and Martin concerning the sequence of the events. Finally, the state presented a motive for the killing when Hunter testified that he had witnessed an argument between King and Hairston the day before the murder. Chambers and Collins similarly testified that King and Hairston were arguing prior the shooting.
 {¶ 48} In sum, the state presented "abundant, compelling," and admissible evidence of King's guilt.[22] Further, the potential prejudice created by the jury's knowledge that King had possessed and concealed firearms in the past was diluted by the fact that the jury would otherwise have been aware that King had previously been convicted of carrying a concealed weapon in 2005, because he testified in his own defense. And in his direct examination, King admitted that he had pulled a gun on Keon Armstrong in September 2004, after Armstrong had threatened him and his friends while they were at a neighbor's house.
 {¶ 49} Finally, the trial court did instruct the jury that the prior-acts testimony could not be considered to prove the character of King in order to show that he had acted in conformity with that character. *Page 16 
 {¶ 50} On this record, the impact of the other-acts evidence was minimal.[23] We hold that King's substantial rights were not prejudiced at trial because there is no reasonable probability that the jury would have acquitted King had the trial court properly excluded the prior-acts evidence.[24] Thus any error by the trial court was harmless.
 Weight of the Evidence {¶ 51} In his final assignment of error, King argues that his conviction was against the manifest weight of the evidence. In evaluating a challenge to the weight of the evidence, this court must review the entire record, weigh the testimony and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving conflicts in the evidence.[25]
 {¶ 52} Central to King's argument is that no physical evidence linked King to the murder. But King has overlooked the Reem Market surveillance videotape that placed him near the scene of the crime shortly before the murder. And despite the lack of physical evidence directly linking the crime to King, there was abundant circumstantial evidence that corroborated Collins's and Chambers's eyewitness testimony.
 {¶ 53} King argues also that the state's identification testimony came from two witnesses who had a motive to exonerate themselves and who were reluctant to testify. This argument does not have merit because it is contradictory: a witness with a strong motive to exonerate himself is not a witness who is reluctant to testify. *Page 17 
 {¶ 54} Finally, King claims that the state's evidence was unreliable because Keon Armstrong, who had also implicated King, had been discredited by the police as a reliable source of information related to the murder. But the fact that the police could not discredit the information from Collins and Chambers bolstered the strength of the state's evidence against King.
 {¶ 55} A review of the entire record convinces us that King was not convicted against the manifest weight of the evidence. Accordingly, we overrule the third assignment of error.
 {¶ 56} Therefore, the trial court's judgment is affirmed.
Judgment affirmed.
HILDEBRANDT, P. J., and DINKELACKER, J., concur.
[1] Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712.
[2] Id.
[3] Id. at 96-97.
[4] Id. at 97-98.
[5] Id. at 98.
[6] See State v. White, 85 Ohio St.3d 433, 1999-Ohio-281,709 N.E.2d 140.
[7] See State v. Hernandez (1992), 63 Ohio St.3d 577, 583,589 N.E.2d 1310, following Hernandez v. New York (1991), 500 U.S. 352,111 S.Ct. 1859.
[8] See State v. Martin, 1st Dist. No. C-050584, 2006-Ohio-5263, at ¶ 7; State v. Lipscomb, 1st Dist. No. C-000737, 2001-Ohio-3909.
[9] See State v. Santiago, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, at ¶ 10.
[10] See Purkett v. Elem (1995), 514 U.S. 765, 768,115 S.Ct. 1769.
[11] Evid.R. 103(A); State v. Lowe (1994), 69 Ohio St.3d 527, 532,1994-Ohio-345, 643 N.E.2d 616.
[12] State v. Jeffers, 10th Dist. No. 06AP-358, 2007-Ohio-3213, at ¶ 6.
[13] Lowe, 69 Ohio St.3d at 530.
[14] See State v. Echols (1998), 128 Ohio App.3d 677, 692,716 N.E.2d 728.
[15] Lowe, 69 Ohio St.3d at 530; State v. Broom (1988),40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.
[16] Lowe, 69 Ohio St.3d at 531 (internal quotations omitted).
[17] Id.
[18] Id. at paragraph one of the syllabus.
[19] See Jeffers, 2007-Ohio-3213, at ¶ 9.
[20] See id. at ¶ 12.
[21] State v. Bayless (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, paragraph seven of the syllabus, vacated in part on other grounds, sub nom. Bayless v. Ohio (1978), 438 U.S. 911, 98 S.Ct. 3135.
[22] State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 49.
[23] See id.
[24] See Bayless, 48 Ohio St.2d 73, at paragraph seven of the syllabus.
[25] See State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. *Page 1