[Cite as *State v. Morrissette*, 2018-Ohio-3917.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170426 |
| | | TRIAL NO. B-1605788 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| JOSHUA MORRISSETTE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 28, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Law Office of John D. Hill, LLC*, and *John D. Hill, Jr.*, for Defendant-Appellant.

**CUNNINGHAM, Judge.**

{¶1}    After a jury trial, Joshua Morrissette was convicted of murder and having weapons while under disability, based on the shooting death of Gregory "G Baby" Tremble, and drug and weapons offenses, based on contraband the police found on Morrissette when he was apprehended for Tremble's murder six months later.  Morrissette now appeals, claiming that his murder conviction was against the manifest weight of the evidence, and that all of his convictions must be reversed due to misconduct by the prosecutor, an erroneous jury instruction on flight, defense counsel's deficient performance, and the cumulative effect of these alleged errors. Because we find no reversible error in the proceedings below, we affirm.

### Shooting Death of Gregory Tremble

{¶2}    Tremble was shot around 4:45 p.m. on April 16, 2016, in front of his sister Naicha's apartment building located at the corner of Vine and Green Streets in Cincinnati.  Forensic evidence from the crime scene demonstrated that the shooting began when Tremble was on the 1700 block of Vine Street and continued as Tremble ran in a southwestern direction away from his shooter and to Green Street, where he succumbed to the injuries sustained from nine gunshot wounds.   The forensic evidence also showed that the bullets were all fired from the same .40-caliber firearm of an undetermined make and model.   Although the police recovered 13 spent casings at the scene and several bullets, the murder weapon was never recovered.

{¶3}    Tremble was a known street-level drug dealer in the area.  At the time of his death, he had on his person a baggie of marijuana and three white "rocks" wrapped in plastic that looked like illegal drugs, but tested negative for a drug of abuse.  The police did not recover any weapons on Tremble.

## Morrissette Identified as the suspect "Psycho"

{¶4} As part of the investigation, Detective Bill Hilbert of the Cincinnati Police Department recovered surveillance video from several cameras set up in the area, including footage from a "panning" camera focused on the 17oo block of Vine Street. That camera showed the area in front of Naicha's apartment and Bill's Supermarket next door. The footage captured at 4:44:50 showed a black man wearing a short sleeved collared red shirt, a black baseball cap, and white athletic shoes, who was reaching for something near his right hip while looking at and walking towards Tremble. Tremble was standing close to where the police recovered most of the spent casings at the crime scene. The camera panned away from the scene before the shooting, but another camera showing people running from the area indicated that the shooting had begun a few seconds after 4:45 p.m. Police cruisers began arriving on the scene at 4:47 p.m.

{¶5} Detective Hilbert later showed the surveillance videos to Chenice Miller who, at an earlier police interview, had implicated a black male she had seen on the day of the shooting wearing a red shirt and a baseball cap and whom she had known for several years by the name "Psycho." Although the images on the surveillance video were blurry, Miller identified the man in the short sleeved collared red shirt with the black cap and white shoes as Psycho. At trial, she identified Morrissette as that individual.

{¶6} According to Miller, shortly before the shooting, she and her boyfriend Dante Cody had been with Morrissette and a tall black male wearing prom attire at the apartment she and Cody shared on East McMicken Street, a few blocks away from Vine and Green Streets. Morrissette, whose niece lived in the same building, had washed their dog for $10. When Miller spoke with Morrissette during

that time, he showed her and Cody a gun and said he was going to "confront" Tremble, a.k.a. "G Baby." Morrissette told them he was upset with Tremble because Tremble had "robbed" someone, either Morrissette or his brother. Morrissette then left the apartment with "Prom Boy," later identified as Melvin Summers, to get "weed."

{¶7} In addition to identifying Morrissette as the man in the red shirt captured by surveillance video at the crime scene on Vine Street just before the shooting, Miller identified Morrissette as the individual captured by an East McMicken Street surveillance camera that day. The first video showed the same man in red exiting from the courtyard of her apartment building and heading in the direction of the 1700 block of Vine Street at 4:40:38 with Summers. A later video began at 4:46:10 and showed that same man in red walking back to her building alone after the shooting and entering the courtyard of the building at 4:46:41. He was ambling casually, with his hand at his waist and glancing repeatedly over his shoulder in the direction of Vine Street. A CD containing these video sequences Miller testified about was admitted as an exhibit at trial.

{¶8} Cody testified, consistent with Miller's testimony, that on the day of Tremble's shooting, a man he knew as "Psycho" had been in their apartment, beginning around 3 or 4 p.m., wearing a red "polo-type" shirt. Cody identified Morrissette as Psycho, and stated that, after washing their dog in the courtyard of the building, Morrissette had shown them a gun and indicated he was "looking for" Tremble, a.k.a. "G Baby," whom Morrissette believed had "robbed" his brother. Cody took photographs of the gun—a .40-caliber Ruger pistol with an extended clip—using his smart phone, and posted the photographs on his Facebook page. The police printed the photographs, taken at 3:50 and 3:51 p.m., and they were admitted as

4

exhibits at trial, along with a photograph Cody had taken at 4:31 p.m. of Morrissette's companion in prom attire.

{¶9} According to Cody, a few minutes before he heard gunshots, Morrissette had taken the Ruger pistol and left the apartment with Summers to "get some weed." Shortly after hearing the gunshots, Cody encountered Morrissette in the courtyard of the building as Morrissette was returning to his niece's apartment. At that time, Morrissette told him that he had shot Tremble.

### Morrissette's Flight, Concealment, and Apprehension

{¶10} Although Morrissette had become a suspect based on the police investigation, including the interviews of Miller and Cody, the police could not find him. Records from Morrissette's former employer, the Society for the Prevention of Cruelty to Animals, showed that Morrissette had last shown up for his job on April 15, 2016, the day before the shooting.

{¶11} The police learned that Morrissette had left town, but had returned to the area in August 2016. The Fugitive Apprehension Unit tried several times to apprehend him after a "secret" warrant for his arrest was issued in August 2016. The police were not successful until October 5, 2016, when Morrissette was spotted as a passenger in a vehicle. The driver followed an officer's instruction to pull over, and Morrissette cooperated by exiting from the vehicle and falling to his knees, allowing an officer to handcuff him without incident. When Morrissette was searched, the police found a loaded .40-caliber Glock pistol in a holster on his right hip and some drugs in his pants pocket and sock. An extended magazine for the Glock was found in the vehicle.

{¶12} Subsequent testing excluded the Glock recovered on Morrissette as the firearm used to shoot Tremble. But the forensic firearms examiner could not rule

out as the murder weapon the .40-caliber Ruger pistol that Miller and Cody had seen Morrissette leave their apartment with minutes before the shooting.

### Additional Evidence of Guilt

{¶13} Morrissette was ultimately indicted on eight counts, including the aggravated murder of Tremble. While he was held in the justice center awaiting trial, Morrissette made several incriminating statements in recorded phone calls that Detective Hilbert had listened to. In some of these phone calls, Morrissette laughed about how he had evaded apprehension by the police through various methods, including once hiding in a tree after fleeing the police and, another time, putting scented substances on his body to avoid alerting police canines that he knew were searching for him.

{¶14} During other phone calls, Morrissette discussed his intention to "plead insanity" as part of the "game," calling it "the biggest break a mother*ucker could push." These statements referenced a prior conversation Morrissette had had with Detective Hilbert, during which the detective had explained that Morrissette could not "plead insanity" without admitting that he had shot Tremble. On another call, Morrissette tried to disassociate himself from his nickname "Psycho." The jail call recordings were admitted into evidence at trial.

{¶15} In January 2017, about six months before Morrissette's trial, Andre Taylor, then an inmate at the Hamilton County Justice Center, contacted Detective Hilbert and told him that he had seen a man he knew as "Psycho" shoot Tremble, a.k.a. "G Baby," on April 16. At trial, Taylor identified Morrissette as the shooter, and recalled that at the time of the shooting, Tremble had looked like he was reaching for something or pulling up his pants. Taylor stated that he had also seen Morrissette before the shooting, early in the morning of April 16. At that time,

Morrissette had shown him a .40-caliber handgun and indicated that he was having a "dispute" with Tremble involving the sale of drugs. Morrissette was angry and said that if Tremble did not pay him, he would shoot him.

{¶16} Taylor further testified that he had seen Morrissette early the next morning. At that time, Morrissette had told him that he had shot Tremble and that Tremble had been "reaching" for a gun. Morrissette also had asked for Taylor's help locating someone to sell his gun.

{¶17} Taylor explained that he was reluctant to come forward because he had been shot five times after testifying in another case. He decided, however, that "it was the right thing to do" for Tremble and his family. He admitted that he had talked to Detective Hilbert about his own case, but made it clear that the state had made "no promises" to obtain his cooperation.

{¶18} Two additional witnesses, Derrel Anderson and Addi Inman, testified at trial that Morrissette had threatened to harm Tremble, a.k.a. "G Baby," before the shooting and had later admitted to shooting him. Anderson contacted Detective Hilbert with information about the shooting in November 2016, when he was locked up in the Hamilton County Justice Center on a "parole holder." Anderson testified that he had seen Morrissette, whom he knew as "Poppy," around 4:00 p.m. at a park on Vine Street about 20 minutes before the shooting. At that time, Morrissette, who was dressed in black, told him he was going to "kill" Tremble, and Anderson observed the outline of what appeared to be a "kind of long" gun tucked into Morrissette's pants. Anderson also testified that when he saw Morrissette in jail after being locked up for a probation violation, Morrissette admitted that he had shot Tremble.

{¶19}   Addi Inman was called as a witness by the court after being declared a hostile witness for the state.  She had contacted crime stoppers and had given statements to Detective Hilbert implicating Morrissette at some point during the investigation, but prior to trial she filed an affidavit with the court indicating that she had been coerced and had no first-hand knowledge relating to Morrissette's criminal proceedings.  Inman testified, however, that in April 2016, she had been living with Morrissette's fraternal twin brother, Josiah, who is the father of her children.  She recalled that a day or two before the shooting, Josiah and Morrissette had awakened her when they angrily complained, after arriving home, about how Tremble had shorted them $15 when they had purchased "weed" from him.  Josiah had said he wanted to "cripple" him, and Morrissette had pledged to "to box" him.   After the shooting, Morrissette admitted to her and Josiah, along with several others, that he had shot and killed Tremble.  Inman also testified that Morrissette left town after the shooting.

{¶20}   Tremble's sister Naicha testified at trial, too, recalling that she had been in her upstairs apartment on Vine Street at the time of the shooting.  After someone shouted that her brother had been shot, she had looked out her window to the street below her and had seen three individuals, including a man wearing an "orange" shirt.  At trial, she identified that man as Morrissette.

{¶21}   At the conclusion of the evidence, the trial court gave the jury an instruction on flight, over the objection of defense counsel.  Ultimately, the jury acquitted Morrissette of aggravated murder, but found him guilty of murder and all other counts, including the drug-and-weapons charges stemming from the date of Morrissette's arrest.  The trial court merged some of the offenses and sentenced Morrissette to an aggregate term of 27 years to life in prison.

## Assignments of Error

### I. Weight-of-the-Evidence Claim

{¶22} In his first assignment of error, Morrissette challenges the weight of the evidence upon which his murder conviction was based. In reviewing a challenge to the weight of the evidence, we sit as the thirteenth juror. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

{¶23} In support of his argument that his murder conviction must be reversed, Morrissette contends that there was a dearth of tangible, physical evidence connecting him to Tremble's murder and that the witnesses' testimony connecting him to the murder lacked credibility. But our review of the record convinces us that the evidence in support of guilt was overwhelming. Contrary to Morrissette's argument, the surveillance video footage showing him reaching for something at his hip while looking at and walking towards the victim, in the exact area where the shooting took place, seconds before the shooting, was substantial physical evidence connecting him to the murder. And the inference from that footage was corroborated by testimony from multiple credible witnesses.

{¶24} For instance, Taylor testified that he had seen Morrissette shoot Tremble and that Morrissette had asked for help in getting rid of his gun after admitting to shooting Tremble. Admittedly, Taylor had not stepped forward as an eyewitness until he had been arrested on his own charges. But Taylor's prior experience as a witness adequately explained his reluctance to assist the police.

{¶25} Miller and Cody testified that Morrissette had been "looking for" Tremble when he left their apartment with a gun compatible with the murder

9

weapon minutes before Tremble was shot. And Cody further testified that Morrissette had admitted to shooting Tremble when, as confirmed by the surveillance video footage, Morrissette returned to Cody's apartment building shortly after the shooting.

{¶26} Other testimony supported a finding of guilt. Anderson and Inman both testified that they had heard Morrissette threaten to kill Tremble and admit to shooting him. Tremble's sister Naicha identified Morrissette as the individual she had seen at the crime scene immediately after the shooting. Finally, Morrissette's statements in his recorded phone calls from jail showed a consciousness of guilt. He admitted that he had fled from and concealed himself from the police to avoid apprehension, intended to feign insanity to avoid a long prison sentence for murder, and had tried to distance himself from the nickname Psycho because he knew it would be connected to the shooter.

{¶27} Admittedly, much of the evidence in support of guilt was circumstantial. But circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶28} Moreover, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. This is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Consequently, we overrule the first assignment of error.

## II.    Prosecutorial-Misconduct Claim

{¶29}   In his second assignment of error, Morrissette contends that he is entitled to a new trial because of misconduct by the prosecutor.  He takes issue with the prosecutor's use of his nickname Psycho throughout the trial and with some comments the prosecutor made during closing argument.

{¶30}   The test for prosecutorial misconduct is whether the prosecutor made improper remarks at trial and, if so, whether those remarks prejudicially affected substantial rights of the defendant.  *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).  Misconduct does not affect the defendant's substantial rights unless it denied the defendant a fair trial.  *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 140; *State v. LeMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 121; *State v. Neeley*, 143 Ohio App.3d 606, 621, 758 N.E.2d 745 (1st Dist.2001).  We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments.  *LeMar* at ¶ 121; *Smith* at 15.

{¶31}   Although Morrissette argues that the prosecutor committed misconduct, except where noted defense counsel failed to object and thus forfeited all but plain error.  *See State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).  To prevail on plain-error review, Morrissette must establish that but for the misconduct, the outcome of the trial clearly would have been otherwise.  *See Slagle* at 605; *State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517 (1st Dist.), ¶ 75, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶32}   *Repeated references to Morrissette as Psycho.*  We first address the misconduct claim stemming from the repeated references to Morrissette as Psycho.

11

It was well established at trial that Psycho was one of Morrissette's nicknames. The prosecutor referred to Morrissette as Psycho when questioning certain witnesses and occasionally during opening statement and closing argument. According to Morrissette, the prosecutor referred to him as Psycho at least 54 times and additionally elicited responses from witnesses establishing the fact that he went by that nickname. He contends these references were intended by the prosecutor to "subtly" paint him as person prone to antisocial behavior.

{¶33} It is improper for a prosecutor to use a nickname for the purpose of impugning the character of the defendant. *State v. Gillard*, 40 Ohio St.3d 226, 230, 533 N.E.2d 272 (1988), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), cited in *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 203. And, in general, an unnecessary use of a disparaging nickname is improper. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 262. But this misconduct does not result in plain error if, when weighing the evidence of guilt against the significance of the reference to the nickname, it is not clear that, had the nickname not been improperly used, the outcome of the trial would have been different. *See Gillard* at 230; *see generally Simmons* at ¶ 77 (Prosecutor's improper and repeated reference to the defendant as the "offender" in closing argument did not affect the outcome of the trial.).

{¶34} Here, the prosecutor at times needed to refer to Morrissette by his nickname Psycho and to elicit responses establishing the nickname for purposes of identification and clarity. For instance, several of the state's witnesses only knew Morrissette as Psycho, and the nickname was used to tie this testimony to the other testimony incriminating Morrissette. The prosecutor also referenced the nickname during closing argument when making a "consciousness of guilt" argument. This

argument was based on Morrissette's statement during a recorded phone conversation directing the other caller who had referred to him as "Psycho" to stop calling him by that name. Morrissette told her, "That's what they want to hear, that's not my name. Everybody keep calling me that. That ain't my name, that's what they want to hear." Morrissette's comments, when read in context, suggest that Morrissette wanted to distance himself from that nickname because he knew witnesses would identify the shooter by that name.

{¶35} The prosecutor used the nickname a few times when it was not required for identification or clarification purposes, such as after a witness who only knew Morrissette as Psycho had already confirmed Morrissette's identity as the defendant. This unnecessary use was improper, but it was not an overt attempt to impugn Morrissette's character and any impugning effect was negligible. At no point did the prosecutor bring up the origin of the nickname or argue that the nickname reflected on Morrissette's character. After considering these facts and the state's overwhelming evidence of guilt, we conclude that the unnecessary use of the Psycho nickname by the prosecutor was not outcome determinative and did not result in plain error.

{¶36} *Alleged misconduct during closing argument.* Morrissette argues the prosecutor committed multiple instances of misconduct during closing argument. A prosecutor is entitled to a certain degree of latitude during summation, and may comment at that time on reasonable inferences from the evidence. *State v. Smith*, 14 Ohio St.3d 13, 13, 470 N.E.2d 883 (1984); *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). We review the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. *Slagle*, 65

Ohio St.3d at 607, 605 N.E.2d 916, citing *State v. Moritz*, 63 Ohio St.3d 150, 157, 407 N.E.2d 1268 (1980).

{¶37} We first address Morrissette's complaint that the prosecutor improperly commented on statements he made during his jail calls indicating that he would plead insanity so that he could be sent to a mental-health facility for a short time instead of serving a long prison sentence. The record shows that in the opening portion of closing argument, the prosecutor mentioned that Morrissette had said some things during recorded jail calls that "[we]re not good for him." The prosecutor then stated:

> You hear [Morrissette] talking [in his jail calls] about wanting to be found not guilty by reason of insanity. To be found not guilty by reason of insanity, you have to have committed the crime. To be found not guilty—John Hinkley [sic] was found not guilty by reason of insanity.

{¶38} Defense counsel objected by stating, "Your Honor, I don't think there is evidence." The court instructed the prosecutor to "move on." The prosecutor did not mention Hinckley again, but again referenced Morrissette's recorded statements involving his intended insanity defense by reminding the jury, "Defendant was stating he thinks this way, he can go to Summit. We learned during trial Summit is a mental health facility in town, and he could be back out in 2021."

{¶39} The state returned to this line of argument in the rebuttal portion of its closing argument, when the prosecutor stated:

> The next thing you have in your universe [of evidence] is these jail calls where he talks about this insanity defense. That's what it is. Insanity defense is, I did it, but I was crazy. * * * I will plead insanity. I will do

five or six years. I will get out of here. I will be sitting in Summit. It

will be a piece of cake.

{¶40} Defense counsel objected to this argument and claimed it was improper because there was "no evidence or testimony or instruction from the court about what insanity or insanity defenses were." The court then instructed the jury, "You have to take the law from me. This is closing argument. This is not evidence. Ladies and gentleman, this jury will determine what the facts are and apply the law to that."

{¶41} The prosecutor then continued:

Are these the statements of an innocent man, I will plead insanity?

You can tell from the conversation he is trying to pull a fast one. I will

plead insanity. I will do five or six years. I will get out of here. I will

be sitting in Summit. It will be a piece of cake. That's not innocence.

It is a subliminal admission of guilt.

{¶42} Morrissette contends the prosecutor's comments transcended the bounds of acceptable argument. Specifically, Morrissette argues the reference to Hinckley, the "would-be assassin" of former President Ronald Reagan, was improper and highly inflammatory. We agree that the reference to Hinckley, which defense counsel objected to, was improper and the prosecutor should not have injected that name into the trial. But we reject any possibility that the prosecutor's fleeting reference to the name denied Morrissette a fair trial. We conclude instead, in the context of the entire closing argument and the other evidence at trial, that the reference to Hinckley was harmless.

{¶43} Next, Morrissette contends these remarks on his plan to plead insanity touched on the issue of punishment, an issue outside the province of the

15

jury. The state argues that Morrissette's statements about pursuing an insanity defense were evidence of consciousness of guilt and, therefore, the prosecutor's statements were a fair comment on the evidence.

{¶44} "Questions of punishment have no place in the trial of guilt or innocence," *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 138, and counsel should not comment on those matters. Here, the state was not directly commenting on Morrissette's punishment in this case, but was using Morrissette's own words to explain why the jury could infer a tacit admission of guilt from Morrissette's intent to feign insanity. Morrissette claims there was an improper "subtext" to the state's argument, that he "was a dangerous criminal who could potentially be back on the streets in as few as five years if the jury didn't do their civic duty to convict him of murdering" Tremble. But Morrissette's reading of the state's argument is a stretch. While we do not condone the prosecutor's comments, Morrissette did not object in the trial court on the ground that the prosecutor was touching on punishment, and he has failed to demonstrate that these comments were outcome determinative.

{¶45} Morrissette also attacks the prosecutor's contention during the rebuttal portion of closing argument that the state's evidence was "completely unrebutted," claiming the prosecutor misrepresented the record and improperly shifted the burden of proof. Morrissette contends the statement was "false" because defense counsel's cross-examination of the witnesses exposed "gaps and inconsistencies" in the evidence and testimony offered by the state. But we conclude that the prosecutor's commentary on the evidence, when read in context, falls squarely within the latitude afforded to counsel.

{¶46} The prosecutor's full argument on this issue was that inconsistencies brought out by the defense were not material. Moreover, the prosecutor's comment was permissible comment on the "relative strength" of the state's case, *State v. Ferguson*, 5 Ohio St.3d 160, 163, 450 N.E.2d 265 (1983), and in no way implied that the state's burden of proof had shifted to the defense. *See State v. Collins*, 89 Ohio St.3d 524, 527, 733 N.E.2d 1118 (2000).

{¶47} Next we address Morrissette's contention that the prosecutor committed prejudicial misconduct by suggesting to the jury that the evidence contained a "behavioral fingerprint" that tied Morrissette to Tremble's murder. The import of the state's argument was that Morrissette's possession of a .40-caliber pistol with an extended magazine at the time of his arrest on October 5, 2016, was indicative that Morrissette was the person who had shot Tremble with a .40-caliber pistol with an extended magazine on April 16, 2016.

{¶48} We agree with Morrissette that this "behavioral fingerprint" argument was improper, as the record did not contain the requisite type of evidence to support the proof-of-identity argument suggested by the prosecutor. *See State v. Echols*, 128 Ohio App.3d 677, 693-694, 716 N.E.2d 728 (1st Dist.1998); *State v. King*, 1st Dist. Hamilton No. C-060335, 2007-Ohio-4879, ¶ 40-44. For instance, the Glock pistol found in Morrissette's possession six months after the murder indisputably was not the murder weapon or the same make as the murder weapon, and Morrissette had not even discharged that pistol when apprehended by the police. Although this argument was not based on the evidence, Morrissette has failed to show plain error on this record, which contains overwhelming evidence of his guilt.

{¶49} Ultimately, we conclude that although some of the prosecutor's comments were improper, the effect of those improper comments, even when

combined, was of no significance and did not result in an unfair trial. Accordingly, we overrule the second assignment of error.

### III.    Erroneous-Flight-Instruction Claim

{¶50}    In his third assignment of error, Morrissette argues the trial court erred in giving a jury instruction on flight. He argues that the evidence did not show he fled from justice, rending the instruction improper. We disagree.

{¶51}    Evidence of the accused's flight, concealment, and related conduct is admissible to show consciousness of guilt. *See State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997); *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969); *State v. Summerlin*, 1st Dist. Hamilton No. C-160539, 2017-Ohio-7625, ¶ 21. An instruction on flight is proper if the record contains sufficient evidence to support the charge. *Summerlin* at ¶ 21. "Flight" means some escape or affirmative attempt to avoid apprehension by the police. *Id.*, citing *State v. Brundage*, 1st Dist. Hamilton No. C-030632, 2004-Ohio-6436, ¶ 17. The decision whether to instruct the jury on flight is a matter within the trial court's discretion and is reviewed for an abuse of that discretion. *Id.*

{¶52}    The state's evidence in this case, if believed, demonstrated that after the shooting Morrissette left town for some period of time and never showed up for work again or contacted his employer to terminate his employment. In the recorded jail calls, Morrissette repeatedly acknowledged that he knew the police had been looking for him and he laughed about successfully eluding them. He recalled eluding apprehension by a squad of police officers by hiding in a tree. On another occasion he had rubbed "hella hair grease," "seasoning," and "cologne" on his body to prevent K-9 police dogs from alerting to his scent. Under these circumstances, we cannot hold that the trial court's decision to give a flight instruction was so arbitrary,

unreasonable, or unconscionable as to connote an abuse of discretion. *See State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980); *Summerlin* at ¶ 21. Consequently, we overrule the third assignment of error.

## IV.    Ineffective-Assistance-of-Trial-Counsel Claim

{¶53}    In his fourth assignment of error, Morrissette contends he was denied the effective assistance of trial counsel because his attorneys failed to object to the state's repeated use and elicitation of the nickname Psycho, and actually joined the state in making such references.

{¶54}    To prevail on an ineffective-assistance-of-counsel claim, Morrissette must demonstrate that counsel's performance fell below an objective standard of reasonableness and he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With regard to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To demonstrate prejudice, Morrissette must establish that, but for counsels' errors, there is a reasonable probability that the result of the trial would have been different. *Strickland* at 694; *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). The failure to make an adequate showing on either prong is fatal to an ineffective-assistance-of-counsel claim. *See Strickland* at 697.

{¶55}    Here, Morrissette cannot prevail on his claim. When disposing of the second assignment of error, we found the prosecutor had acted improperly when he referred to Morrissette as Psycho in instances where that reference had not been required for identification purposes, but concluded that any improper use of the nickname had not affected the outcome of the trial. We determined that any impugning effect was negligible when weighed against the overwhelming evidence of

guilt. For similar reasons, we hold that defense counsels' failure to object to the state's unnecessary use of the name and defense counsels' own allegedly unnecessary use of the name at trial was not outcome determinative, either. The jury was not told the origin of the nickname and it was not used in an impugning manner. Although the nickname was used a significant number of times, this alone does not demonstrate the requisite prejudice to establish an ineffective-assistance-of-counsel claim. The strength of the state's evidence was such that we are confident the jury would have found Morrissette guilty of the offenses even absent the allegedly deficient performance by trial counsel. Accordingly, we overrule the fourth assignment of error.

## V. Cumulative-Error Claim

{¶56} In his final assignment of error, Morrissette argues that the cumulative effect of the errors at trial deprived him of his right to a fair trial. Under the cumulative-error doctrine, a conviction may be reversed if the cumulative effect of errors deemed separately harmless have the collective effect of denying the defendant a fair trial. *See State v. Cook*, 1st Dist. Hamilton No. C-140118, 2014-Ohio-4900, ¶ 15, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶57} Here, we determine that Morrissette was afforded a fair trial, notwithstanding the cumulative effect of the errors occurring at trial. For this reason, we overrule the fifth assignment of error.

## Conclusion

{¶58} Morrissette has failed to demonstrate reversible error. He was provided a fair trial, at which the state presented overwhelming evidence of his guilt. Accordingly, we affirm Morrissette's convictions for murder, having weapons while

under disability on April 16, 2016, and October 5, 2016, aggravated possession of hydrocodone, and possession of cocaine.

Judgment affirmed.

**MOCK, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.